COMMONWEALTH *vs.* PAUL SHANLEY.

Middlesex. September 10, 2009. - January 15, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Child Abuse. Evidence,* Expert opinion, Qualification of expert witness, Scientific test. *Witness,* Expert. *Constitutional Law,* Assistance of counsel. *Practice, Criminal,* Assistance of counsel, New trial, Judicial discretion, Argument by prosecutor, Instructions to jury. *Limitations, Statute of. Indecent Assault and Battery.*

In criminal proceedings arising from indictments charging rape and indecent assault and battery on a person under the age of fourteen years, arising from sexual abuse that allegedly occurred between 1983 and 1989, the judge, in denying the defendant's motion to exclude expert testimony offered by the Commonwealth for the purpose of assisting the jury in determining the credibility and consequent reliability of the victim's testimony that he had recovered memories nearly twenty years after the abuse, did not err in concluding, based on supporting evidence in the record, including not only expert testimony but also a wide collection of clinical observations and a survey of academic literature, that the lack of scientific testing did not make unreliable the theory that an individual may experience dissociative amnesia [761-766]; further, the defendant failed to demonstrate that his trial counsel was ineffective for failing to prevent the admission of such expert testimony [766-769]; or for failing to challenge it adequately at trial [769-772].

At the trial of indictments charging rape and indecent assault and battery on a person under the age of fourteen years, in which the victim alleged that he had recovered memories of sexual abuse that occurred between 1983 and 1989, the prosecutor's remarks in closing argument, which highlighted *testimony about forgetting and remembering traumatic events aside from a* diagnosis of dissociative amnesia, were proper and did not give rise to a substantial risk of a miscarriage of justice [772-774]; further, the prosecutor's closing argument properly touched on the victim's motivation in appearing to testify, a primary issue in the case, in response to an attack by the defense on the credibility of the victim [774-778].

At the trial of indictments charging, inter alia, indecent assault and battery on a person under the age of fourteen years, arising out of sexual abuse that allegedly occurred between 1983 and 1989, the judge erred in his instruction to the jury regarding the statute of limitations, which incorrectly allowed the jury to consider the period before the statute began to run in determining whether the Commonwealth had met its burden of proving that the defendant was not usually and publicly a Massachusetts resident so as to toll the running of the statute; however, the erroneous instruction, which neither was objected to nor pertained to an element of the offense, did not give rise to a substantial risk of a miscarriage of justice, given the

considerable strength of the Commonwealth's evidence that the defendant had left the Commonwealth during the proper time period. [778-782]

INDICTMENTS found and returned in the Superior Court Department on June 9, 2002.

The cases were tried before *Stephen E. Neel*, J., and a motion for a new trial, filed on November 14, 2007, was heard by him.

The Supreme Judicial Court granted an application for direct appellate review.

*Robert F. Shaw, Jr.*, for the defendant.

*Loretta M. Lillios & Bethany Stevens*, Assistant District Attorneys, for the Commonwealth.

The following submitted briefs for amici curiae:

*R. Christopher Barden & Eric Tennen* for International Committee of Social, Psychiatric, Psychological, Cognitive Science, Neuroscience, and Neurological Scientists.

*Paul R. Rudof*, Committee for Public Counsel Services, for Committee for Public Counsel Services.

*Wendy J. Murphy* for Leadership Council for Child Abuse and Interpersonal Violence.

*Thomas A. Pavlinic* for False Memory Syndrome Foundation.

CORDY, J. On February 7, 2005, Paul Shanley was convicted of sexual abuse of a child: two indictments charging rape, in violation of G. L. c. 265, § 23; and two indictments charging indecent assault and battery on a person under the age of fourteen years, in violation of G. L. c. 265, § 13B. The abuse occurred between 1983 and 1989 when the victim was attending Confraternity of Christian Doctrine (CCD) classes at the church where the defendant served as a Catholic priest. The victim testified that he did not remember being abused by the defendant until nearly twenty years later, when he learned that other individuals had publicly made allegations that the defendant had sexually abused them when they were children. The victim's testimony about what he remembered of that abuse constituted the core of the evidence against the defendant at trial.

The defendant appealed from his convictions, and subsequently filed a motion for a new trial. The appeal proceedings were stayed pending resolution of the new trial motion, which was denied by the trial judge on November 26, 2008. The defendant

appealed from the denial of this motion and that appeal was consolidated with the appeal from his convictions. We granted the defendant's application for direct appellate review.

On appeal, the defendant contends that he is entitled to a new trial because (1) the judge erred in admitting expert testimony related to "repressed memory"[1]; (2) his trial counsel was ineffective for failing to prevent the admission of such expert testimony and for failing to challenge it adequately at trial; (3) the prosecutor made improper arguments during her closing; and (4) the judge erred in his instruction to the jury regarding the statute of limitations on the indecent assault and battery indictments. We affirm.

1. *Trial.* a. *The Commonwealth's case.* The Commonwealth's case included the testimony of the victim as to his memory of the abuse he suffered at the hands of the defendant; the testimony of witnesses who observed the victim during the period of time when he claims he recovered that memory; the testimony of an expert witness on dissociative amnesia and recovered memory; and the testimony of individuals who could corroborate that the victim both attended CCD classes during the time period he alleges he was abused, and occasionally left those classes for behavioral reasons. The Commonwealth also presented evidence regarding the defendant's role and presence at the church where the abuse occurred, as well as his whereabouts outside of Massachusetts after he left that church in 1990.[2]

Setting aside the victim's testimony regarding the alleged sexual abuse, and the testimony of the Commonwealth's expert, the jury could have found the following facts. The defendant was a priest at St. Jean's Church in Newton during the years when the victim was enrolled in CCD classes there. He would often check on the children while they were in their CCD classes on Sundays. Children ranging from the ages of six to fourteen, including the victim, attended these classes.

---

[1]The terms "repressed memory," "recovered memory," and "dissociative amnesia" were used interchangeably throughout the pretrial and trial proceedings and generally refer to the phenomenon of completely forgetting and later recovering a memory.

[2]Evidence regarding where the defendant resided after 1990 and up until his indictment in 2002 is relevant to the statute of limitations defense and jury instructions, and is discussed in more detail *infra*.

The victim was born on September 9, 1977, and grew up in Newton with two siblings. His parents separated when he was four years of age and, after a short stay with his mother, he lived primarily with his father in his paternal grandmother's house. The victim attended CCD classes with the same group of children at St. Jean's Church from first grade (in 1983) until he reached eighth grade. During the years the victim attended CCD classes, some of the children became quite boisterous and periodically were required to leave the classroom. The victim and two of his friends in particular were disciplined often, both in the lower grades and when they were in fourth or fifth grade. On occasion, the defendant admonished those who were required to leave the classroom for misbehavior, and the victim was observed leaving the classroom with the defendant on several occasions.

Several years after graduating from high school, the victim joined the Air Force. After being trained as an Air Force police officer, he was stationed at Peterson Air Force Base in Colorado Springs, Colorado. He returned home to Massachusetts for a visit in spring of 2001 and began a romantic relationship with Tammy.[3] Their relationship continued when the victim returned to Colorado, with Tammy visiting the victim and the two often speaking on the telephone.

Tammy telephoned the victim on January 31, 2002, and mentioned an article published in a Boston newspaper concerning the defendant and allegations of child sexual abuse. The victim expressed surprise at the contents of the article, commenting to Tammy, "That's weird, everybody liked him." After this conversation, the victim began remembering being taken out of CCD class by the defendant, but he did not remember anything else. He also began reading newspaper articles on the Internet about the allegations and looking at photographs of the defendant.

On February 11, 2002, Tammy again telephoned the victim and told him that one of his childhood friends and former CCD classmates had made an allegation of abuse against the defendant. The victim had a strong emotional and physical reaction to this news. Shortly after this conversation, the victim contacted his flight chief and said that he was not coming to work.

Later on that same day, the victim spoke with the childhood

---

[3] A pseudonym.

friend who had made the allegation of abuse. Early the next morning, the victim contacted a personal injury attorney, with whom he later entered into a fee agreement. The victim also went to see Captain John F. Drozd, a psychologist on the Air Force base to talk with him about his mental state.[4] He stayed at Drozd's office for ten to twelve hours and felt awful, confused and sick. Drozd recommended that the victim keep a journal, which he did, backdating his entries to the first conversation with Tammy on January 31.[5]

The victim returned to Massachusetts on February 15, 2002.[6] He briefly returned to Colorado,[7] where he ultimately received an honorable discharge from the military in April, 2002. He then returned to live with Tammy in Massachusetts. After joining a civil suit brought against the Archdiocese of Boston (based on the abuse he alleged against the defendant) he received a settlement in the amount of $500,000.

With respect to the sexual abuse, the victim testified at the defendant's trial to the following based on the memories that came back to him after learning of the allegations made by others. The defendant began sexually abusing him when he was approximately six years of age and first began attending CCD classes. The defendant would take the victim out of his CCD class, bring him to the bathroom in the basement, unzip the victim's pants, watch him urinate, and then touch the victim's penis with his hand and mouth.

The defendant also sexually assaulted the victim in the pews of the church after the victim put pamphlets in the pews for the

[4]Captain Drozd talked to the victim and administered a test to him. He also changed the victim's military status so that he was temporarily disqualified from performing security duties and from carrying a firearm.

[5]Drozd described the journal to the victim as being "an emotional barf bag" and directed the victim to record everything that came into his mind.

[6]Drozd had filled out a request for the victim to take temporary leave. Tammy testified that the victim was very agitated while he was home and would soak the sheets with sweat and curl up into a ball.

[7]Because of the change in his status and his disqualification from security work when the victim returned to Colorado, he was employed in the visitors' center for civilian guests to the military base. He tried to return to work, but had to leave after a few hours because he "couldn't be around people." The victim continued to see Drozd and was taking the medications Celexa, Zoloft, and Trazodone. He also developed "a stress rash" on his body for one or two weeks. The victim never returned to work as an Air Force police officer.

upcoming Mass. He would do so by sitting next to the victim, putting his right arm around the victim, touching the victim's penis through his clothes, and grabbing the victim's hand and putting it on his own penis over his clothing. The defendant would also bring the victim into the confessional room, which was located "off the side of the pews," where the defendant would undress them both and place his finger in the victim's anus.

Finally, the victim testified that the defendant would bring him to the rectory, get him soda and a snack from the kitchen, and then play the card game, "War." When the victim would lose a hand, the defendant would instruct him to remove a piece of his clothing. When the victim would go on a "winning streak," the defendant would remove his clothing.

The abuse of the victim continued until the defendant left the Newton church in 1990 when the victim was approximately thirteen years of age. The defendant told the victim that no one would ever believe him if he disclosed the abuse.

The Commonwealth called Dr. James A. Chu as an expert in the field of dissociative amnesia. He was not called to give a diagnosis of the victim, but rather to assist the jury in determining the credibility of the victim's testimony that he had recovered memories nearly twenty years after the abuse, and their consequent reliability. His qualifications as an expert were not contested by the defendant at trial.[8]

Dr. Chu testified that dissociative amnesia is a diagnosis included and defined in the Diagnostic and Statistical Manual (DSM). That manual is published by the American Psychiatric Association, and is a classification manual widely used by mental health professionals in making diagnoses of mental health problems. The DSM lists criteria for a clinician to consider when making a particular diagnosis. Dr. Chu was a member of the task force in the 1990's charged with reviewing dissociative disorder diagnoses for the purpose of preparing the most recent version of

---

[8]Dr. Chu is a licensed psychiatrist and the chief of clinical services at McLean Hospital. His speciality is the diagnosis and treatment of adults who have been seriously traumatized as children, and he has treated patients suffering from such trauma for nearly thirty years. He is certified by the American Board of Psychiatry and Neurology and Adult Psychiatry, and is a distinguished fellow within the American Psychiatric Association.

the DSM, DSM-IV, which was published in 1994.[9] He explained that in the DSM-IV, dissociative amnesia is a "descriptive term [for] somebody who cannot remember certain important information about themselves, either about what happened to them, sometimes personal information . . . not . . . due to . . . head trauma or intoxication." It means, "basically, that there is a dissociative barrier that prevents somebody from remembering something in their ordinary state of consciousness."

In describing how dissociative amnesia works, Dr. Chu testified that it is possible for a person to forget something and remember it later. Dr. Chu observed the phenomenon in his own clinical practice with adults who had been traumatized as children and explained that while it was not common in that population, it was "not at all rare." He analogized dissociative amnesia to a type of forgetting, which "leads to people having really pervasive amnesia for not only [traumatic] events themselves, but [also] sometimes for neutral events or even good events." He explained that persons who have experienced repeated traumatization suffer from dissociative amnesia more often than those who experience a single traumatic event.

He went on to testify that when a person remembers "so-called forgotten memories," it is usually the result of a "trigger of some kind" which reminds that person of the traumatic experience.[10] While there was no typical pattern for the subsequent reaction of a traumatized person once there has been a trigger, the person may experience memory flashes or "body sensations." More specifically, a person might experience physical sensations that mirror the sensations he or she incurred from the trauma itself (for example, genital pain where a person had suffered

---

[9]Dr. Chu testified that a particular diagnosis is included in the DSM only after a "fairly rigorous process by which interested groups of people" may convene a task force or engage in field trials to test a new diagnosis of a specific syndrome. The diagnoses in the manual are subject to revision and evolve over time. The dissociative amnesia diagnosis first appeared as such in the third edition of the DSM, DSM-III.

[10]Dr. Chu gave examples of various triggers that he has observed, including that childbirth may be a trigger for a woman who was sexually abused as a child because the genital pain, fear, and helplessness of childbirth are similar to sensations that the woman may have experienced as a sexually abused child. Another example that he gave was a mother who experiences a trigger when her own child reaches the age at which she experienced abuse.

sexual abuse); or have a subsequent reaction to a trigger, become overwhelmed by the sudden onset of traumatic memories and experience "people panic," that is, agitation, crying, and increased adrenaline. He further explained that, although it is "highly variable" among individuals, the return of such memories may lead to disruption or dysfunction in a person's life.

Dr. Chu also testified about the quality of the memory that might be recovered with the caveat that "all . . . memories are subject to various kinds of distortion." In general, however, "the central themes of memories are really relatively well-preserved," with distortions as to peripheral details and perhaps the sequence of the memory. He also explained that a person may not remember everything about a particular event all at once, that instead, the memory might progressively return. Dr. Chu identified the ways in which a clinician would go about testing the validity of a memory recovered many years later, including determining whether a person's life changed abruptly at a certain time, whether the person has had the ability to begin and maintain interpersonal relationships, and whether the narrative of the person's life is believable and reasonable.

Dr. Chu acknowledged that it was possible for a new memory to be created in some people that has no basis in reality. He gave common examples of this phenomenon on a minor scale, but explained that there was "probably only a very small minority of people who are vulnerable to that kind of suggestion."

Dr. Chu concluded by estimating that dissociative amnesia occurs in approximately twenty per cent of the seriously traumatized population.

b. *The defense case.* The defense at trial was threefold: first, that the abuse did not happen; second, that the victim had significant financial and personal reasons to fabricate the abuse (including getting discharged from the Air Force and participating in the civil suit against the Boston Archdiocese); and third, that the theory of repressed memory is inherently unreliable given the problem with corroboration and the possibility of false memories. The first two prongs of the defense were presented through the cross-examination of the Commonwealth's witnesses. The third was developed initially through the cross-examination of Dr. Chu, during which he acknowledged that there are profes-

sionals in the psychiatric community who do not believe there is sufficient evidence to verify the existence of dissociative amnesia, and that clinical research on the subject relies to a significant extent on the self-reporting of the patient — a methodological limitation. This prong of the defense was enhanced by the testimony of Dr. Elizabeth Loftus, an expert witness, and the only witness called by the defense.

Dr. Loftus is a professor at the University of California at Irvine in the Department of Psychology and Social Behavior and the Department of Criminology, Law, and Society. She is also a member and former president of the American Psychological Society, which has several thousand members focusing on the science and teaching sides of psychology. Her qualifications as an expert were not contested by the Commonwealth at trial.

Dr. Loftus testified that she has conducted research on memory and memory distortion, including experiments in the 1970's and 1980's where her research group evaluated the reliability of eyewitness testimony to a simulated accident or crime scene by subjecting the eyewitnesses to misinformation, such as leading questions or media accounts of the incident, to determine the impact, if any, on their recall of the event. She further elaborated that her research in the 1990's expanded the theories of misinformation to see whether people could be implanted with entirely false memories, for example, by making a person think that he or she had been lost in a shopping mall as a child. She explained that one quarter of the persons involved in this experiment believed in the false memory of being lost.

Dr. Loftus described memory as involving the construction or reconstruction of experiences where a person may blend later occurring details into the memory of an event. She explained that many things could affect the accuracy of a memory, including factors related to the perception of an event as it occurs, such as lighting and distance and the exposure to postevent information such as leading questions or media coverage, which can distort or supplement a memory. Dr. Loftus also explained that the passage of time made memories weaker and thus more vulnerable to postevent contamination. She explained that a false memory is a false belief accompanied by sensory detail.

In addition, Dr. Loftus testified that it was "virtually impos-

sible without independent corroboration" to determine the difference between an accurate memory and a false one. She stated that the impact of trauma on a memory is that while the core of the memory might be recalled, the peripheral details may be distorted.[11] In contrast to Dr. Chu, Dr. Loftus testified that repetitive traumatic experience would make it more likely that someone would remember a particular event.

She elaborated on the controversy surrounding "repressed memory" and explained that in her view of the literature there is no "credible scientific evidence for the idea that years of brutalization can be massively repressed." She noted that it was possible to retrieve unpleasant memories through ordinary remembering and forgetting, but there was a lack of current scientific support for the theory that some "special mechanism" would "banish [traumatic experience] into the unconscious." She also explained that there was "inherent limitation" in the method of studies used to test for repressed memory, namely, that the retrospective memory technique relies on self-reporting by patients.

2. *Discussion.* a. *Admission of expert testimony.* The role of expert testimony is to assist jurors in interpreting evidence that lies outside their common experience. The proponent of such testimony bears the burden of establishing that it "will assist the trier of fact to understand the evidence or to determine a fact in issue," see Mass. G. Evid. § 702 (2008-2009), and that the methodology or theory underlying the expert testimony is sufficiently reliable to be presented for the jury's consideration.[12] *Id.*

Trial judges serve an important gatekeeping function with respect to expert testimony. *Commonwealth* v. *Lanigan*, 419 Mass. 15, 26 (1994) (*Lanigan*). As a gatekeeper, the judge must make a preliminary assessment whether the theory or methodology underlying the proposed testimony is sufficiently reliable to reach the trier of fact.[13] For these purposes, expert testimony

---

[11]On cross-examination, Dr. Loftus acknowledged that it is more difficult to distort the central details of a memory.

[12]The proponent of the evidence also has the burden of establishing that the witness he intends to call is qualified as an expert in the relevant area, a matter not at issue in this case. See Mass. G. Evidence § 702 and note at 207-208 (2008-2009), and cases cited.

[13]The judge must also determine whether the reasoning or methodology can be applied to the facts in issue — that is, whether there is a proper "fit" between the two.

is sufficiently reliable if the underlying theory or methodology is either (1) generally accepted in the relevant scientific community, see *Frye* v. *United States*, 293 F. 1013 (D.C. Cir. 1923); or (2) satisfies the alternative requirements adopted in *Lanigan*, *supra* at 25-26. The judge may hold a pretrial hearing (*Lanigan* hearing), as he did here, to assist in making this preliminary assessment. A judge's decision to admit expert testimony is subject to review only for abuse of discretion. *Canavan's Case*, 432 Mass. 304, 312 (2000). Once admitted, the validity and credibility of the expert testimony is subject to challenge like any other testimony, including through the admission of opposing expert testimony, and it is for the jury to determine what aid it might provide to their deliberations.

In this case, the victim was expected to testify that he had been abused many years ago, but had only recently remembered that abuse. To assist the jury in understanding how memories of abuse might be forgotten and later remembered, the Commonwealth proposed to offer expert witness testimony to explain the theory, condition, and symptoms of dissociative amnesia and recovered memory. In response, the defendant moved to preclude such testimony because the theory underlying it could not meet the test of reliability required for admission.[14]

(i) *The* Lanigan *hearing.* In considering the defendant's motion, the judge was initially of the view that a *Lanigan* hearing might not be required because this court, in *Commonwealth* v. *Frangipane*, 433 Mass. 527 (2001), had both permitted expert testimony "concerning dissociation and recovered memory; what these conditions or symptoms are; and the fact that victims of trauma may experience them," *id.* at 535, and suggested that no *Lanigan* hearing was necessary as to expert testimony which concerned "memory problems associated with dissociative memory loss, and related mental disorders . . . such as those referred to in the most recent edition of the [DSM], or those disorders where qualified expert testimony has been accepted as reliable in the past in Massachusetts appellate cases." *Id.* at 538.

Despite his misgivings about whether it was required, the judge proceeded to conduct a *Lanigan* hearing that extended

---

[14]The defendant also moved to suppress the trial testimony of the victim based on the ground that recovered memory is inherently unreliable.

over five days.[15] During that hearing, two experts retained by the Commonwealth, Dr. Daniel Brown and Dr. Chu, were called to testify. In addition to this testimony, the judge considered, without objection from the Commonwealth, an affidavit prepared by Dr. Loftus and submitted by the defendant.

Dr. Brown was called by the Commonwealth to explain the theory, conditions, and symptoms of dissociative amnesia and recovered memory and their general acceptance in the scientific community. Dr. Chu, who had been retained by the Commonwealth, was called to testify about the "fit" of the proposed opinion testimony regarding dissociative amnesia and recovered memory, to the facts of this case. The defendant does not challenge Dr. Chu's testimony on this subject, or on the ruling of the judge that the "fit" was sufficient in this case. We focus then on Dr. Brown's testimony.

Dr. Brown is a licensed psychologist, an assistant professor of clinical psychology at Harvard Medical School,[16] and an adjunct professor at the Simmons School of Social Work. He specializes in treating patients who have been the victims of trauma, e.g., physical abuse, sexual abuse, child neglect, accident, torture, and natural disasters. He has previously given expert testimony in judicial proceedings regarding dissociative amnesia in five States and has also testified about memory and trauma at the international war crimes tribunal. He is the author of twelve books, including a text entitled, "Memory, Trauma Treatment and the Law," which presents a comprehensive review of 2,500 clinical and laboratory studies on human memory.

---

[15]The judge correctly surmised that hearings held pursuant to *Commonwealth v. Lanigan*, 419 Mass. 15, 26 (1994) (*Lanigan*), may not always be required where qualified expert testimony of the same type and offered for the same purpose has been accepted as reliable in the past in Massachusetts appellate cases. See *Commonwealth v. Frangipane*, 433 Mass. 527, 538 (2001). However, we have not "grandfathered" any particular theories or methods for all time, especially in areas where knowledge is evolving, and new understandings may be expected as more studies and tests are conducted. See *Lanigan, supra* at 26-27. Despite what we said in *Commonwealth v. Frangipane, supra*, the evolving nature of scientific and clinical studies of the brain and memory and the controversy surrounding those studies made it prudent for the judge to proceed with a *Lanigan* hearing in this case.

[16]For fourteen years, Dr. Brown was responsible for the annual course on the assessment and treatment of psychological trauma at Harvard Medical School.

Dr. Brown testified that based on his clinical experience, his review of thousands of studies regarding various aspects of memory, and his analysis of eighty-five studies focused on amnesia in childhood sexual abuse cases, many of which were subject to peer review, it was his opinion that dissociative amnesia exists for a clinically significant minority of traumatized individuals, including children subjected to sexual abuse. He also testified about the evolution of the use of dissociative amnesia as a diagnosis in the DSM, which has been revised several times. He opined that this diagnosis is generally accepted in the field and cited six surveys of psychology professionals, including psychiatrists, psychologists, social workers and clinicians working with war veterans, to that effect. According to those surveys (taken collectively), eighty-nine per cent of those surveyed accepted the validity or possible validity of dissociative amnesia.

Dr. Brown acknowledged that there is controversy surrounding the existence of dissociative amnesia and the difficulty in determining its existence in a particular individual.[17] He also highlighted some of the problems with determining the existence of dissociative amnesia, and agreed that a person with a suggestible personality might be susceptible to false memories suggested by a trusted source, and that an extremely suggestive process of interviewing a subject could also create false memories.

Defense counsel cross-examined Dr. Brown for two days about the problems affiliated with determining the existence of repressed memory; the difficulties of corroborating the details of recovered memories; the difficulty in making a precise diagnosis in accordance with the DSM-IV; the uncertainty as to the cause or neurological or biological mechanisms that lead to dissociative amnesia; and the likelihood that a particularly suggestible person would develop false memories or malinger. In that examination, defense counsel brought to the judge's attention the contentions of the critics of repressed memory theory based on the lack of a scientific method to test for it in individuals; the absence of a controlled methodology; and the methodological limitations of

---

[17]Dr. Brown also testified that much of the current research and debate is centered on determining what neurological or psychological processes or mechanisms cause dissociative amnesia. The Commonwealth did not propose to offer expert testimony on the neurological or psychological processes or mechanisms that might cause dissociative amnesia.

clinical observation and experience that depend so greatly on patient self-reporting.

(ii) *The judge's decision.* The judge denied the defendant's motion to exclude expert testimony on dissociative amnesia and recovered memory, concluding that the diagnosis and theories behind it were generally accepted in the relevant scientific community. In doing so, the judge recognized the significance of its listing as a diagnosis in DSM-IV, and credited the testimony of Dr. Brown that "clinically significant minorities of [victims of child sexual abuse] experience amnesia," testimony that was buttressed by the studies cited to and relied on by Dr. Brown which "reflect[ed] a broad-based acceptance of dissociative amnesia and recovery." Contrary to the defendant's arguments that controversy regarding the validity of a theory necessarily precluded a determination that the theory is generally accepted, the judge recognized the controversy, was fully aware of its contours, and rejected it as being determinative in light of the other evidence of acceptance. *Lanigan, supra* at 27 ("Unanimity of opinion among the relevant scientists is not essential even under the general acceptance test"). That other evidence, the judge pointed out, included statements of both the American Medical Association and the American Psychiatry Association, that "memories of traumatic events can be forgotten but that pseudomemory formation is also possible," in addition to the 1996 final report of the American Psychological Association working group on the investigation of memories of childhood abuse, which included points of agreement among the group members (including Dr. Loftus) that (1) it is possible for memories of abuse that have been forgotten for a long time to be remembered, and (2) it is also possible to construct convincing pseudo memories for events that never occurred.[18]

---

[18]Critics of repressed memory theory argue that it is flawed because of the risk that so-called false memories can be created where therapeutic or forensic intervention is suggestive. The judge was well aware of this risk and its impact on the validity of the theory and addressed this point in his memorandum of decision, stating, "[T]he Court rejects any suggestion that the relevant scientific community generally accepts the notion that the fact that false memories may be created in some individuals invalidates the conclusion that dissociation and recovered memory occur in others. In any event, whether one or the other is at work [in this case] is for the jury to decide, with such aid as admissible expert opinion from both sides may provide."

The defendant argued below, and argues on appeal, that because there is a lack of peer-reviewed literature regarding repressed memory, the judge improperly concluded that the theory is generally accepted. We defer to the findings of the judge with regard to the testimony of Dr. Brown that was based, in part, on his review of eighty-five studies focused on amnesia in childhood sexual abuse cases, which were conducted in a variety of contexts, including surveys and clinical evaluations, as constituting sufficient and reliable peer review for the purposes of general acceptance. See *Canavan's Case*, 432 Mass. 304, 314 n.6 (2000) ("A relevant scientific community must be defined broadly enough to include a sufficiently broad sample of scientists so that the possibility of disagreement exists").

The defendant's other arguments are equally unpersuasive. They essentially echo the contention made by Dr. Loftus and other critics of repressed memory theory that the theory is invalid because there does not yet exist a scientific method using experimental design to test for its existence in certain individuals nor are there known error rates or standardization.[19] The judge, while well apprised of the contention that studies of dissociative amnesia are unreliable because of methodological flaws, explicitly found that "the methodological criticisms . . . by Dr. Loftus [in her affidavit were] rebutted [by Dr. Brown in his testimony]."

In sum, the judge's finding that the lack of scientific testing did not make unreliable the theory that an individual may experience dissociative amnesia was supported in the record, not only by expert testimony but by a wide collection of clinical observations and a survey of academic literature. See *Canavan's Case*, *supra* at 313 ("Observation informed by experience is but one scientific technique that is no less susceptible to *Lanigan* analysis than other types of scientific methodology"). There was no abuse of discretion in the admission of expert testimony on the subject of dissociative amnesia.

b. *Ineffective assistance of counsel.* The defendant moved for a new trial pursuant to Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), on the grounds that he was denied the

---

[19]Dr. Loftus acknowledged that there are severe ethical concerns in designing an experimental study to test the possibility of false memory by implanting memories of abuse in human subjects.

effective assistance of counsel both at the *Lanigan* hearing and at trial. His claims relate to defense counsel's alleged failure to challenge adequately the admissibility of the expert testimony at the *Lanigan* hearing, and his failure to defend effectively against it at trial. Essentially, the defendant alleges that had counsel done better work in either proceeding, the outcome would have been different. In support of his motion for a new trial, the defendant submitted three affidavits from experts,[20] and more than fifty scholarly articles, surveys, and studies, some of which were peer reviewed,[21] questioning the existence of repressed memory.

A trial judge "may grant a new trial at any time if it appears that justice may not have been done." Mass. R. Crim. P. 30 (b). The decision to grant a motion for a new trial is within the sound discretion of the motion judge who is entitled to "special deference" if he was also the trial judge. *Commonwealth* v. *Figueroa*, 422 Mass. 72, 77 (1996).

In evaluating claims of ineffective assistance, the court engages in "a discerning examination and appraisal of the specific circumstances of the given case to see whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is

[20]The experts included Harrison G. Pope, Jr., a practicing board certified psychiatrist and professor of psychiatry at Harvard Medical School. Dr. Pope stated that one of his primary teaching areas involved helping faculty and students to design scientifically valid research studies and to evaluate the methodology of other studies. He attached thirty examples of scientific publications questioning the validity of the repressed memory hypothesis to his affidavit. See note 28, *infra*. The defendant also submitted an affidavit from Dr. Loftus in which she stated that she provided very minimal assistance in the pretrial stage and that her testimony at trial was limited by her experience to the scientific study of memory, rather than its clinical counterpart. The third expert was R. Christopher Barden, who has both a doctorate in clinical child psychology and a law degree. He identifies himself in his affidavit as a "national expert in psychology and law." The substance of his affidavit criticized the performance of the defendant's trial counsel and attempted to discredit Dr. Brown.

[21]Taken collectively, the articles further illustrated the controversy over repressed memory, that the theory was questionable because it could not be tested with scientific methods; that there was the possibility of false memories; that clinical techniques could lead to the formation of false memories; and that there was uncertainty about the neurological mechanism which caused repression.

found, then, typically, whether it has likely deprived the defendant of an other available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). See *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977) ("there ought to be some showing that better work might have accomplished something material for the defense"). See also *Commonwealth* v. *DiGeronimo*, 38 Mass. App. Ct. 714, 719-720 n.6 (1995).

If a defendant challenges the "tactical or strategic decisions," of trial counsel, he must establish them as "manifestly unreasonable." *Commonwealth* v. *Montanez*, 410 Mass. 290, 295 (1991), quoting *Commonwealth* v. *Adams*, 374 Mass. 722, 728 (1978). We are cautious on review "to avoid characterizing as unreasonable a defense that was merely unsuccessful." *Commonwealth* v. *White*, 409 Mass. 266, 272 (1991).

With respect to the *Lanigan* hearing, the defendant's claim that counsel was ineffective in his challenge to the admissibility of expert testimony is largely belied by the transcript of the hearing. Defense counsel cross-examined Dr. Brown for nearly two full days and in doing so, thoroughly and precisely illuminated for the judge the issues and the controversies surrounding the scientific validity and acceptance of the theory of dissociative amnesia and the reliability of recovered memory. His attack on the proposed evidence was both sophisticated and knowledgeable, and provided the judge with the information necessary to a full understanding of the nuances of the debate about the subject. Defense counsel also methodically challenged Dr. Brown by highlighting for the judge any possible bias related to Brown's testimony in prior litigation and his association with less credible authors and scholars.

In addition, and in connection with the motion for a new trial, the judge carefully reviewed all of the affidavits and the recent scientific articles, surveys, and studies submitted by the defendant. Those materials suggest that an increasing number of mental health professionals have concluded not only that no empirical evidence supports the theory of dissociative amnesia, but also that false memories can occur as a result of a number of factors. After this review, the judge reached several conclusions: first, that there was no dispute at the *Lanigan* hearing (or at trial) that in some individuals false memories can be

implanted, but the existence of such false memories "does not negate the case for the existence of repressed memories"; second, that the lack of unanimity in the scientific community regarding the theory of dissociative amnesia does not rule out its admissibility (citing *Lanigan, supra* at 26-27); and third, that there is ample evidence of the acceptance of the diagnosis in its inclusion in the DSM-III-R and the DSM-IV, and in its acceptance by the American Psychiatric Association and the American Medical Association, as well as by a number of appellate and trial courts.

Finally, the judge concluded that even had defense counsel produced (at the *Lanigan* hearing) all of the evidence submitted with the motion for a new trial, his decision to admit the evidence on the basis of its general acceptance by the relevant scientific community would not have changed. Consequently, the "better work" that the defendant now claims his counsel should have done would not have accomplished anything material, and the defendant was not deprived of a substantial defense. After our own review of the record before the judge, we agree that the defendant has not satisfied his burden of demonstrating that his counsel provided ineffective assistance at the *Lanigan* hearing.

We reach the same conclusion with respect to defense counsel's performance at trial. The defendant complains about his counsel's decision to call Dr. Loftus as the sole defense witness to testify about the unreliability of expert testimony on the subject of dissociative amnesia. This, however, was only one prong of the defense case which, importantly, focused both on the victim's possible fabrication of the abuse for the purpose of personal benefit, and the possibility that false memories of abuse had resulted from the process of memory recovery.

Defense counsel elicited from Dr. Loftus not only testimony that dissociative amnesia was not a theory accepted by a large segment of the scientific community, and had never been scientifically proved, but also (based on her extensive experience and studies in the field of memory) that there were a number of suggestive influences that substantially increased the likelihood that a particular memory is false — some of which were present in the facts of this case.[22] That counsel might have offered even

_____

[22]Dr. Loftus explained she had designed experimental situations to test for the presence of false memory by using sources of suggestion such as leading

more evidence on these subjects does not amount to ineffectiveness. Although the defendant argues that Dr. Loftus's lack of clinical experience disadvantaged her during cross-examination, her background as a research scientist buttressed the defense theory that clinical observations provided insufficient foundation for the reliability of repressed memory, and that the implantation of false memories was a scientifically documented phenomena.

More generally, defense counsel conducted a vigorous defense on all fronts, which included a thorough cross-examination of the victim and Dr. Chu, further exposing for the jury the potential problems with the reliability of evidence based on memories recovered after dissociative amnesia.[23] He highlighted for the jury the academic debate involving the existence and manifestation of dissociative amnesia, underscoring the fact that there is no demonstrable evidence to corroborate that the phenomenon exists. He examined Dr. Chu about the possibility that a person susceptible to suggestion could be implanted with a false or pseudo memory, and Dr. Chu acknowledged there were those in the field who believe that the more an individual has the capacity to dissociate memories, the more he is likely to develop pseudo memories. Defense counsel further undercut the relevance of studies related to dissociative amnesia to this case by getting Dr. Chu to admit that such studies provided no illumination as to the question whether any particular individual might be affected by dissociative amnesia. Dr. Chu also acknowledged that the self-reporting aspects of the clinical setting provide limitations in answering the question of whether there is demonstrable evidence that dissociative amnesia exists.

---

questions, allowing a subject to overhear someone else's recollection of an event, and media coverage of an event. Here, there was evidence that the victim learned of the allegations of abuse from media reports and from speaking to a childhood friend who also claimed to have been abused.

[23]For example, during cross-examination, Dr. Chu admitted that determining whether abuse occurred to particular individuals was at best, "reasonable speculations." He also admitted, consistent with the defense theory that the abuse did not happen, that determining the validity or accuracy of a memory is perhaps a secondary concern in the clinical setting, where the well-being of the patient takes priority over investigating the truth of a memory; and that the victim here had significant incentive to fabricate. Defense counsel also questioned Dr. Chu extensively about the possibility that the victim was malingering or otherwise exaggerating or fabricating the occurrence of abuse.

Finally, defense counsel utilized the DSM-IV in questioning Dr. Chu, focusing the testimony on the DSM-IV's cautionary language regarding the use of DSM-IV in forensic settings where the patient has been referred by an attorney, and in making a diagnosis of dissociative amnesia where there is "currently no method for establishing with certainty the accuracy of such retrieved memories in the absence of corroborative evidence."

In sum, this is not a case where "the record reveal[ed] that, notwithstanding an over-all high quality of work at trial, defense counsel's conduct or failure to act in a particular instance was so serious a lapse as to enhance significantly the chance of a defendant's conviction." *Commonwealth* v. *DiGeronimo*, 38 Mass. App. Ct. 714, 719-720 n.6 (1995). Counsel pursued a dynamic, multi-faceted trial strategy that did not rely solely on challenging the admission of the expert testimony, but also on exploring the factual deficiencies in the victim's version[24] of events and by impeaching his credibility and his motivations.[25] The trial judge's denial of the defendant's motion for a new trial on the ground of ineffectiveness was not an abuse of discretion.

We cannot say that counsel's performance at trial with regard to the testimony about repressed memory was lacking, see *Commonwealth* v. *Saferian*, 366 Mass. 89, 96-97 (1974); or that counsel's strategic decision to rely largely on cross-examination of witnesses was manifestly unreasonable. See *Commonwealth* v. *Montanez*, 410 Mass. 290, 295 (1991). Finally, we are not persuaded that counsel failed to pursue an otherwise available, substantial ground of defense that might have accomplished something material for the defense. See, e.g., *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 & n.10 (1977). The defendant's principal argument is not that his trial counsel failed to pursue a particular defense, but that he failed to do so as effectively as he could have. However, we evaluate counsel's performance not to determine whether in hindsight he might have done things

---

[24]Defense counsel cross-examined nearly all of the Commonwealth's "fact" witnesses about the layout of the church, the bustling Sunday atmosphere at St. Jean's and the number of persons who resided in the rectory during the relevant time period.

[25]Both the financial settlement from the lawsuit and the testimony from the expert witnesses that a person might malinger or fabricate the appearance of dissociative amnesia to avoid military service bore directly on the victim's credibility.

differently and perhaps more effectively, but to determine whether he provided representation commensurate with that of an "ordinary fallible lawyer." *Commonwealth* v. *Saferian, supra* at 96. He did so in this case.[26]

c. *Closing argument and comments by the prosecutor; memory analogy.* The defendant argues that he suffered severe prejudice when, in attempting to counteract a possible rejection by the jury of the theory of repressed memory, the prosecutor equated that theory with ordinary forgetting and remembering in her closing argument; and, in doing so, misrepresented and mischaracterized the testimony of both Dr. Chu and Dr. Loftus. The defendant further argues that if defense counsel knew that the prosecutor would analogize the victim's repressed memory to ordinary forgetting and remembering during her closing, he would have called an expert to rebut this comparison.[27]

The Commonwealth responds that the theory of the case was

[26]We also decline the defendant's invitation to grant a new trial on the ground of "fundamental unfairness" in light of what appellate counsel declares was the admission of "demonstrably false" information about the acceptance of "repressed memory" in the scientific community. This claim is based on the affidavits and relevant published material submitted in support of the motion for a new trial. Having reviewed that material, we are not persuaded that the judge erred when he concluded that he would have permitted the Commonwealth's expert to testify in any event on the basis of the full record before him — including the testimony at the *Lanigan* hearing. Nor are we persuaded that the record in this case requires that we second guess the judge or reach a different conclusion.

The defendant does not challenge on appeal the sufficiency of the evidence. We do not consider whether there could be circumstances where testimony based on the repressed or recovered memory of a victim, standing alone, would not be sufficient as a matter of law to support a conviction.

[27]The defendant also argues that Dr. Chu improperly used the term "forgetting" instead of "repression" in his testimony and otherwise "with obfuscation" used the terms "forgetting" and "remembering" at trial.

Specifically, Dr. Chu testified as to the following:

"There is ordinary forgetting. Sometimes people forget pretty awful things just through normal forgetting. There seems to be another kind of forgetting that happens when somebody tries so hard not to think about something for so long that eventually they can't even remember it if they try to remember it. And then there seems to be this other kind of, I would call more of a dissociative mechanism where, especially with chronic traumatization . . . that really leads to people having really pervasive amnesia . . . ."

not exclusively limited to the validity of the theory of dissociative amnesia because the victim was never actually diagnosed with that disorder. Instead, the jury were entitled to reject the testimony regarding dissociative amnesia, the purpose of which related to the victim's credibility regarding the delay in reporting the sexual abuse, and still find that the victim had remembered the sexual abuse in reliable detail. The Commonwealth further argues that, at a minimum, the state of the evidence changed with Dr. Loftus's testimony that, notwithstanding her view that the underlying theory of dissociative amnesia had not been scientifically validated, it was nonetheless plausible that a person could forget a traumatic event and then remember it through the processes involved with ordinary memory.[28]

The defendant did not object to the prosecutor's closing on this ground at trial. Therefore we review his claim to determine whether there was error and, if so, whether it gave rise to a substantial risk of a miscarriage of justice. *Commonwealth* v. *Randolph*, 438 Mass. 290, 297-298 (2002).

Prosecutors are required to limit their arguments to facts in evidence and reasonable inferences that may be drawn from those facts. *Commonwealth* v. *Beaudry*, 445 Mass. 577, 580 (2005), quoting *Commonwealth* v. *Coren*, 437 Mass. 723, 730 (2002). A defendant's challenge to a specific part of a closing argument is analyzed in "the context of the whole argument, the evidence admitted at trial, and the judge's instructions to the jury." *Commonwealth* v. *Whitman*, 453 Mass. 331, 343 (2009).

Here, the prosecutor's comments about the testimony of Drs. Chu[29] and Loftus[30] with regard to "remembering" and "forgetting," were not in error. There was testimony about forgetting

---

[28]On cross-examination, Dr. Loftus testified that she wrote in a 1996 article that it was "possible for people to forget about traumatic experiences and later remember them." She elaborated that she would refer to that as "ordinary forgetting and remembering, possibly triggered by a retrieval cue."

[29]With regard to Dr. Chu, the prosecutor stated: "He came here and told you, he told you about things that make sense: that sometimes people forget about things that happen to them and then they remember them later on."

[30]With regard to Dr. Loftus, the prosecutor stated:

"Even Dr. Loftus, although she started out on her direct saying that 'it is a very vitriolic debate; this cannot happen; there cannot be such a thing as massive repression.' Within two minutes, when I was asking

and remembering traumatic events aside from a diagnosis of dissociative amnesia, a fact recognized and articulated by the judge prior to closing argument.[31] The prosecutor's argument highlighted that testimony and there was no error.

    d. *The "voluntary" appearance and testimony of the victim at trial.* The defendant argues that given the importance of the victim's credibility to the prosecution of this case, the prosecutor improperly buttressed his credibility throughout the trial by suggesting to the jury that he appeared "voluntarily" and not by subpoena or as a result of a contractual agreement related to the settlement of the civil suit.

    This issue arose early in the trial when defense counsel objected to the prosecutor's opening statement that, "[y]ou will learn . . . that [the victim] filed a civil lawsuit against the [Boston] Archdiocese, [which] paid him $500,000 last May with no requirement that he testify in this criminal trial." The

---

    her, she agreed with me, 'oh yeah, people can forget traumatic experiences that happened to them, and they can later remember them.' And what did she say? 'And if something happens to you over and over again, you remember it even better.' "

The prosecutor later stated:

    "But, ladies and gentlemen, think about it for a minute. Hasn't it all happened to one of us: the walking down the street and you bump into someone, or you are at a high school reunion, just like Dr. Loftus said, and you see someone who you haven't seen in a long time and you start talking. And all of a sudden you remember the time that the two of you were out together and you ran out of gas and you got stranded by the side of the road, and then you got into trouble because you missed your curfew. Now, you hadn't thought about that 10, 12 years, but now you remember. Does it make it any less real that you hadn't thought about it? Does it mean that it never happened? No. Use your common sense."

[31]Defense counsel requested a jury instruction that the Commonwealth had to prove the existence of repressed memory in order for the jury to find the defendant guilty because if the phenomenon exists, the victim's testimony was truthful, but if not, then the victim must have been fabricating the abuse. In declining to include the requested instruction, the judge noted that in addition to the mutually inconsistent theories related to repressed memory suggested by the defendant, there existed a third basis for the jury's decision, namely, "[M]emories of childhood sexual abuse may be forgotten and remembered without being repressed. So that seems to me an alternate theory that the Commonwealth can argue from the evidence." The defendant did not object to the judge's ruling.

prosecutor countered that the Commonwealth should be entitled to respond because the defense was going to argue that the victim was biased and motivated by the civil settlement. The judge agreed to take the objection into consideration, but declined to give an instruction addressing the civil case immediately after the opening statements, stating that he would be willing to give an instruction at the time the parties introduced evidence of the civil settlement.

The issue arose again before the direct examination of the victim. Defense counsel objected that it would be improper for the prosecution to suggest that victim's appearance in the case was somehow voluntary, and argued that it would be unethical "for the Commonwealth to try to suggest to the jury that this witness has anything to do with the processing of this case notwithstanding whatever policies they may have about forcing people to do or not do anything." The prosecutor again countered that the Commonwealth had a right to rebut the defense's suggestion that the victim was testifying because of the civil settlement and that it was proper to elicit testimony that he was not under subpoena and was under no obligation to appear to testify. The judge agreed to give an instruction that the Commonwealth had exclusive discretion in deciding which witnesses to call in attempting to prove its case against the defendant beyond a reasonable doubt. Defense counsel agreed to wait and see how the victim's testimony developed before requesting such an instruction. The victim testified on direct examination that payment of the civil settlement did not have any conditions attached to it and that he did not appear at trial because of a subpoena. The defense did not object to this testimony, did not move to strike it from the record, and did not request the instruction that the judge had proposed.

In his cross-examination of the victim, defense counsel proceeded to question him extensively about the fact that he had spoken with a lawyer about potentially joining a class action suit against the Boston Archdiocese on February 11, the same day on which that the victim alleged he recovered his memories of abuse.

Later, at the charge conference, defense counsel again sought to preclude the Commonwealth from arguing that the victim's appearance was voluntary and not compelled by subpoena or

any agreement related to the civil trial. The prosecutor countered that defense counsel's cross-examination of the victim suggested that he was lying about having been abused and that the civil lawsuit was the motivation for his lies. The judge ruled that the Commonwealth could comment in its argument about the victim's voluntarily appearing (as was established by the evidence), but would not be permitted to appeal to sympathy or "any improper use of that evidence."[32] The defendant's objection was overruled.

In her closing, the prosecutor stated:

> "[The victim] is a twenty-seven year old man. He's recently married. He has a job that he loves . . . . He has half a million dollars in his pocket. So why, ladies and gentlemen, did he come in here and tell you what happened to him? Why? What does your common sense tell you?

> "You saw him on that stand for almost 14 hours day after day, hour after hour, he willed himself through that testimony. You saw it. What does your common sense tell you?

> "He came in here and he told you what happened because that man, that defendant, that priest, raped him and molested him when he was a little boy over and over again. The defendant would have you believe it is all a lie. It's for the money; that people don't forget about things that happen to them and then later remember them. . . .

> "Was it all a lie? Was it made up? Did [the victim] come in here and just lie about it? Was it for the money? He has the money. He got the money over nine months ago. No strings attached. What did he get from coming in here? The opportunity to be on the stand? He sustained long, painful questioning, and what did he get from it? It's not about the money. Put that aside. Is it all a lie? . . .

> "And [an attorney] filed a civil lawsuit on behalf of

---

[32]The prosecutor never used the term "voluntary" or "voluntarily" in her opening statement, in her cross-examination of the victim, or in her closing. Nor did she mention in her closing that the defendant had not been subpoenaed.

[the victim], and [the victim] got a half a million dollars. True. But so what? It's all done, signed, sealed, delivered to the bank. And it's done. No more words need to be said. That's over. And it has been over for over eight months. That's what you know. That's what you know about what happened."

Prior to addressing the jury, the judge suggested a limiting instruction to the parties to address the victim's participation in the civil suit.[33] Defense counsel asked that the judge refrain from instructing the jury on that issue. Therefore, no limiting instruction on the civil suit was given.

The defendant relies on *Commonwealth* v. *Beaudry*, 445 Mass. 577 (2005), for the proposition that the Commonwealth's argument was improper. In that case, the prosecutor argued that the child complainant was credible simply because she testified at trial and that she did not have any motive to lie. *Id.* at 586. Defense counsel objected to the argument and the judge gave a limiting instruction to the jury, stating, "[T]he fact that a complaining witness has come into court and testified before you does not entitle that witness to any greater credibility. . . . [T]he mere fact that somebody has come into court to testify does not mean that their testimony is entitled to be believed by you because of the mere fact that they showed up in court and testified." *Id.* at 586-587.

Here, the substance of the prosecutor's closing argument properly touched on the victim's motivation in appearing to testify because it was a primary issue in the case. Unlike in the *Beaudry* case, the defense strategy was to assail the credibility of the victim by suggesting that he had a motive to fabricate the allegations of abuse, both because of the civil suit and because of a latent desire to get out of the Air Force. Therefore, the prosecutor was warranted in "mak[ing] a fair response to an attack on the credibility of a government witness." *Commonwealth* v. *Senior*, 454 Mass. 12, 17 (2009), citing *Commonwealth* v. *Chavis*, 415 Mass. 703, 713 (1993). *Commonwealth* v. *Smith*, 450 Mass. 395, 408, cert. denied, 129 S. Ct. 202 (2008) (noting that prosecutor's

[33]The instruction was: "I instruct you that neither the civil case nor the settlement of that case has any bearing on the prosecution of this criminal matter."

comment regarding government witnesses motives to lie "was a legitimate attempt to defend the credibility of these two witnesses"). There was no error.

e. *Statute of limitations.* The two indictments charging indecent assault and battery, in violation of G. L. c. 265, § 13B, were returned on June 20, 2002. The offenses they allege last occurred on October 5, 1986. The relevant statute of limitations provides that an indictment for such an offense must be "found and filed within six years after such crime has been committed; provided, however, that any period during which the defendant is not usually and publicly a resident within the commonwealth shall be excluded in determining the time limited." G. L. c. 277, § 63, as amended through St. 1996, c. 26. It further provides that for the crimes charged here, "the period of limitation for prosecution shall not commence until the victim has reached the age of sixteen or the violation is reported to a law enforcement agency, whichever occurs earlier." *Id.*, as appearing in St. 1987, c. 489.

It was stipulated at trial that the victim reached the age of sixteen years of age on September 9, 1993. Consequently, the prosecution was required to commence no later than September 9, 1999, unless the defendant was not "usually and publicly a resident within the commonwealth" for some period of time before September 9, 1999. The parties also stipulated that the indictment was returned 1,015 days beyond the six-year limitation date.

The statute of limitations defense was initially raised by the defendant in a motion to dismiss. At a scheduled hearing on pretrial motions, the prosecutor, defense counsel, and the judge agreed that, while properly advanced in the motion to dismiss, the resolution whether the indictments were timely brought raised a question for "a finder of fact in the context of trial."

At trial, the prosecutor presented evidence from which the jury could have found that the defendant resided outside of Massachusetts for almost the entire period from 1990 (when he left St. Jean's Church) until May, 2002, just before he was indicted. The witnesses from whom the Commonwealth elicited this evidence were cross-examined by defense counsel regarding the basis for their testimony, establishing that they were

relying largely on records and not their own personal knowledge. In her closing, the prosecutor argued that the Commonwealth had proved that the defendant was not usually and publicly a resident in the Commonwealth for a sufficient period of time to satisfy its burden of demonstrating that the indictments were timely brought under the statute. The prosecutor also requested a specific jury instruction on the statute of limitations, which the judge gave in its entirety, and to which the defendant did not object.

The judge's instruction essentially told the jury that the statute of limitations for the indecent assault and battery offense "would have expired" on September 9, 1999, "unless the Commonwealth has proved beyond a reasonable doubt that the defendant was not usually and publicly a resident of the Commonwealth for at least 1,015 days between October 5, 1986, the last date of the offenses, and June 20, 2002, the date the indictments were returned in this case."

In his motion for a new trial, the defendant contended that this instruction was error as it allowed the jury to consider the period before the six-year statute began to run (October 5, 1986, through September 9, 1993) in determining whether the Commonwealth met its burden of proving that he was not usually and publicly a resident of Massachusetts for those 1,015 days. In denying the motion for a new trial, the judge declined to decide whether the instruction was an incorrect statement of the law, and instead concluded that because the defendant had not presented any evidence that he was in the Commonwealth between September 9, 1993, and June 20, 2002, he was not, in any event, entitled to an instruction on the statute of limitations.[34] The judge reasoned that insofar as the defense of the statute of limitations is an affirmative defense, see *Commonwealth* v. *Steinberg*, 404 Mass. 602, 606 (1989), the defendant had the burden of producing evidence to support the defense at trial before the Commonwealth had any burden of disproving it. Therefore, in the absence of his production of any such evidence, the defendant was not entitled to an instruction. Alternatively, the judge concluded that any "presumed" error in his instruction did not create a substantial

---

[34]The judge apparently did not remember a stipulation admitted in evidence, that the defendant was in Massachusetts for forty-three days between October 16 and December 30, 1993.

risk of a miscarriage of justice because the result of the trial would not have been different had the error not been made.

We first conclude that the instruction was error. Whether the defendant resided in or outside of Massachusetts before the statute of limitations began to run on September 9, 1993, is not relevant to whether, once statutorily commenced, the six-year period was thereafter tolled for any period of time by the defendant's absence.[35] The instruction should have focused the jury's attention only on the defendant's usual and public residence during the period after September 9, 1993.

We next conclude that the statute of limitations defense was properly raised, preserved, and sufficiently presented by the defendant in this case. We have repeatedly referred to the statute of limitations defense as an affirmative defense, *Commonwealth* v. *Steinberg, supra* at 606, citing *Couture* v. *Commonwealth*, 338 Mass. 31, 33 (1958), and have explained with respect generally to affirmative defenses that where asserted, "the defendant takes on a burden of production because the Commonwealth has no burden of disproving an affirmative defense 'unless and until there is evidence supporting such defense,' " *Commonwealth* v. *Cabral*, 443 Mass. 171, 179 (2005), quoting Model Penal Code § 1.12(1), (2) (1985). "If the defense is 'affirmative,' once a defendant raises the defense to a charge and the defense is supported by sufficient evidence, the defendant is entitled to have a jury instruction on the defense, and the Commonwealth has the burden of disproving the defense."[36] *Id.* We have never had occasion specifically to address what evidence the defendant

---

[35]Although it is not explicitly referred to in G. L. c. 277, § 63, as a "tolling" provision, we have consistently referred to it as such. See, e.g., *Couture* v. *Commonwealth*, 338 Mass. 31, 32 n.1 (1958) (noting that it was not necessary for Commonwealth to plead "the exception tolling the statute").

[36]While we have referred to a statute of limitations defense as an "affirmative defense," it differs from what we ordinarily understand to be a defining characteristic of such defenses, that is, that they involve, "a matter of . . . *justification* peculiarly within the knowledge of the defendant on which he can fairly be required to adduce supporting evidence" (emphasis added). *Commonwealth* v. *Cabral*, 443 Mass. 171, 181 (2005), quoting Model Penal Code § 1.12 (3)(c). The defendant here is not seeking to excuse or justify his actions by claiming some type of lawful authority. Cf., e.g., *id.* at 172 (defendant claimed he was agent of a surety and therefore had lawful authority to detain person who defaulted on bail); *Commonwealth* v. *Vives*, 447 Mass. 537 (2006) (defendant's claim of right to property in armed robbery case). Rather, it is

must adduce in order to be entitled to an instruction on a statute of limitations defense.[37]

We need not decide what might be necessary in every case where a challenge to the timeliness of an indictment is brought, but in this case, where the Commonwealth was on full notice that the defense was being raised, evidence that the victim's sixteenth birthday was more than six years before the indictments were returned was sufficient evidence of untimeliness to require the Commonwealth to prove that the limitations period was properly tolled under the provisions of G. L. c. 277, § 63. The defendant was not otherwise required to offer evidence that he was "usually and publicly a resident within the commonwealth," in order to raise and preserve the defense. Consequently, the defendant was entitled to a proper instruction on the subject.

Finally, we agree with the judge that based on the evidence at trial, the erroneous instruction (which was neither objected to nor pertained to an element of the offense) did not give rise to a substantial risk of a miscarriage of justice. The Commonwealth's evidence that the defendant left the Commonwealth in 1990 and, but for a forty-three day period in 1993, was not usually or publicly a resident of Massachusetts until he returned in May, 2002, was very strong.[38] It was so strong that even though defense counsel had cross-examined the Commonwealth's wit-

the Commonwealth that contends that it is justified in bringing the indictments beyond the six-year statute of limitations because the defendant was absent from the Commonwealth.

[37]The parties do not contest, that once properly raised, the Commonwealth has the burden of proving beyond a reasonable doubt that the indictments have been timely brought.

[38]The Commonwealth introduced testimony from the keeper of records for the Boston Archdiocese, who testified that there was a change of address form dated February 14, 1990, for the defendant, listing a new address in Palm Springs, California. He also testified that there was another change of address form in the file dated March 6, 1995, with a new address in New York City. Another clergy member who worked in the Archdiocese's administrative offices testified that he had written a memorandum in January, 1990, referencing the defendant's move to California, and that the office also had several different addresses, all in California, for the defendant during the time from 1990 to late 1994. A third member of the clergy testified that he corresponded with the defendant during late 1995 and early 1996 at a New York City address. A fourth member of the clergy testified to corresponding with the defendant at a New York City address throughout 1997 and then writing a memorandum referencing the defendant's arrival in San Diego, California. He also testified

nesses, he made no reference to the issue in closing argument. A review of the evidence suggests that this failure was not a shortcoming of counsel, but based on a realistic assessment of the state of the evidence before the jury. Had the jury been properly instructed, we have little doubt that the result would have been the same. *Commonwealth* v. *LeFave*, 430 Mass. 169, 174 (1999).

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*

---

that he wrote letters to the defendant in San Diego on July 13, 1998, and March 3, 1999.

In addition, the Commonwealth introduced copies of the defendant's New York resident tax returns from 1995 and 1998, and his resident income tax returns from San Diego, California, for 1997. The Commonwealth also introduced a stipulation based on California Department of Motor Vehicle records that the defendant listed San Diego as his address as of January 24, 2002. The parties further stipulated that the defendant returned to Massachusetts from California on May 6, 2002, and, on arrival, commented about the changes in the city since he had last been there.